[No. B010072. Second Dist., Div. Five. Nov. 13, 1986.]

MAURICE MANSON et al., Plaintiffs and Respondents, v.
STEWART REED et al., Defendants and Appellants.

COUNSEL

Baker & McKenzie, Bruce H. Jackson and Mark D. Patrizio for Defendants and Appellants.

Sherman, Feld & Stauber and Robert J. Sherman for Plaintiffs and Respondents.

OPINION

HASTINGS (Gary), J.*—Appellants, Stewart Reed and Millie Reed, are appealing from a judgment awarding compensatory and punitive damages for fraud against them and in favor of respondents after a court trial. The

---

*Assigned by the Chairperson of the Judicial Council.

primary issue revolves around a real estate sales transaction and whether or not the antideficiency provisions of Code of Civil Procedure section 580b prevent recovery of damages against the appellants. If the answer is in the negative, appellants also raise the following issues: insufficiency of the evidence to support the judgment against Stewart Reed; that punitive damages awarded against Stewart Reed cannot be sustained as a matter of law; that attorney's fees were improperly awarded; that if attorney's fees were properly awarded they were excessive; and finally, by footnote, challenge is made to the amount of damages awarded.

## FACTS

The following facts have been taken from the record directly or are reasonably inferred therefrom. ■ The appellate court must review the facts in the light most favorable to the respondents in order to determine whether or not substantial evidence exists which would support the conclusions reached by the trial court. In this regard, all conflicts must be resolved in favor of the respondents and the appellate court will not substitute its deductions for those of the trial court. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].)

Respondents are Maurice and Mary Manson (Mansons). The Mansons were husband and wife for over 18 years. Mr. Manson was an actor and photo journalist, and his wife was a teacher. Neither of them had any education or training or sophistication in the real estate market or in real estate transactions. In 1979 the Mansons' marriage was dissolved. As part of the judgment of dissolution of marriage, they were required to sell their residence located at 3814 Ventura Canyon, Sherman Oaks, California. Because of their financial situation, each was required to continue residing at the residence until they could sell the house and divide the proceeds.

Appellants are Millie Djordjevic, aka Millie Reed (Millie Reed hereinafter), and Stewart Reed. Stewart Reed is a businessman primarily residing in Massachusetts but with businesses throughout the United States, including Southern California. When in Southern California, he resided with Millie Reed at 3841 Ventura Canyon, just down the block from the Mansons. Millie and Stewart, at all times, held themselves out as husband and wife. However, they were not married.

The Mansons initially listed their house for sale in 1979. However, by midyear, 1980, there had been no appreciable action on the house and the Mansons decided to change brokers. Millie Reed urged Mrs. Manson to utilize her broker, Leonard Mandell (Mandell), insisting that he had very successfully sold a number of houses for her and that he had just sold the

Reeds' house at 3841 Ventura Canyon. The Mansons were persuaded and in the fall of 1980 arranged to have Mandell Realty list their house.

Shortly after the listing, Millie Reed approached the Mansons and suggested that her mother buy their house. The Mansons asked Mandell to follow up but the deal fell through.

In March of 1981, Mandell approached the Mansons on behalf of Millie Reed with an offer for Millie Reed to purchase the house. Both Mandell and Reed represented to the Mansons that Mrs. Reed wanted to buy the house and do substantial remodeling of the house and then sell it for a substantial profit. Both Mandell and Millie Reed told the Mansons that Millie Reed had experience remodeling and reselling houses for substantial profits and that Mandell had aided her in these ventures. However, Mandell advised that because of the real estate sales climate then existing, the Mansons would have to consider "creative financing" and that unless they did so they would be unable to sell their house. He advised them that "creative financing" meant "cash back" to the buyer, Millie Reed. He advised that she would use the cash to do the remodeling which would increase the value of the house. Neither of the Mansons understood any of the ramifications of a "cash back" transaction, but they were convinced by Mandell and Millie Reed that this was the only way to sell the house and that the value of the house would be enhanced. Millie Reed advised the Mansons that she already had a contractor in the wings, Jack Rucker, to do the work.

Mrs. Reed was unable to obtain financing by herself so the negotiations which began in March were not fruitful. Therefore, in June 1981, Mr. Stewart Reed joined with Mrs. Reed in making a joint offer for the purchase of the property. Mr. Reed spoke with the Mansons and confirmed that Millie was a very good interior decorator and that she had bought and remodeled and sold numerous houses in the past very successfully. He also reiterated that Rucker was set up to do the work on the house and that when the work was done it could be sold for a substantial profit. The Mansons at all times believed the Reeds were husband and wife and that Mr. Reed's credit and financial backing would be utilized to support the transaction and pay off the loan obligations if necessary.

Beverly Hills Savings & Loan did an appraisal on the house of $183,000. This was the ultimate price that was agreed upon between Mr. Manson and Mr. Reed. The Reeds then arranged to obtain a loan for $146,400 from Beverly Hills Savings & Loan, which loan was secured by a first trust deed on the property being purchased. Because the Mansons had no expertise in this area, they relied on Mandell to structure the deal. They were advised that they would receive $100,500 from escrow and a note signed by both

Reeds for $82,500 payable at $1,237.50 a month beginning July 12, 1981, and every month thereafter until June 12, 1984. Also, there would be a payment of $10,000 on the principal at the end of the first year as well as $10,000 on the principal at the end of the second year. The remainder was to be paid off on June 12, 1984. The note was to be secured by a second trust deed on the property. The Reeds were to receive $46,000 from escrow which would be used for the remodeling of the house. The Mansons further accepted the suggestions of Mandell and Millie Reed that they use The Escrow Shoppe to close the deal.

To consummate the transaction, Mandell and The Escrow Shoppe set up two separate escrows. The first escrow was set up to effectuate the sale of the house to the Reeds and involved the funding from Beverly Hills Savings & Loan. This original escrow was opened at the Studio City office of The Escrow Shoppe. A second escrow, termed a "loan escrow," was opened at the Encino office of The Escrow Shoppe and was for the $82,500 "loan." Neither of the Mansons understood that there were two separate escrows and just assumed that all of this was the same transaction. They signed whatever documents were presented to them. The purpose for the two escrows was to prevent the original lender from knowing that there was "cash back" to the buyer. This is a disfavored transaction among initial lenders and they will generally not go through with the loan if they are aware of the nature of the transaction.

To effectuate the matter, the Reeds both signed a promissory note for $82,500 in favor of the Mansons and a second trust deed to secure the loan. The Mansons at all times relied upon the promise by both Millie Reed and Stewart Reed, as contained in the promissory note, to make payments on the loan. However, unknown to the Mansons, Stewart Reed was merely lending his name to this transaction so that Millie Reed could obtain the loan from Beverly Hills Savings & Loan and complete the transaction with the Mansons. Stewart Reed had no intent whatsoever at any time of ever making any payments on the loans or of putting any money of his into the matter. Mr. Reed was sophisticated sufficiently in real estate sales transactions to know that antideficiency statutes existed in California and he was under the belief at all times that the transaction was structured such that the antideficiency statutes would protect him as well as Millie Reed from any recourse by the Mansons. The Mansons were unaware of the antideficiency statutes and were not sophisticated enough to understand what they meant or that there were any such statutes in existence in California.

The first escrow, dealing with the actual purchase of the house, was closed two days before the so-called "loan" escrow that was being held in Encino. The Mansons received $100,500 out of the escrows, some of which went

to costs and broker's fees, etc. They also received the $82,500 promissory note and deed of trust. The Reeds received $46,000 out of escrow and also had to pay certain costs and fees so that they netted approximately $39,000. Mr. Reed immediately transferred the entire amount to Millie Reed and gave her a quitclaim deed to the property. The Mansons were unaware of these transfers.

After the transaction was completed, Millie Reed made one payment on the second trust deed but no payments on the first trust deed. She did a minimal amount of "face lifting" and no substantial remodeling of the house. The Reeds occupied the house for three to four months and then abandoned it. The house was put up for sale by the Reeds through Mandell but no sale occurred. In fact, Beverly Hills Savings & Loan foreclosed on the property for failure of the Reeds to make payments on the first trust deed. Beverly Hills Savings & Loan bought the property for the outstanding amount owed on the first trust deed plus costs of sale, leaving the Mansons holding their worthless second trust deed and promissory note. This suit followed.

### The Antideficiency Statute

Appellants argue that the transaction between the Mansons and the Reeds was a "purchase money" transaction and therefore falls within Code of Civil Procedure section 580b and prevents recovery against the Reeds. Respondents argue that the "Cash back" transaction was a "hard money" transaction for construction purposes and falls outside of the statute. The pertinent portion of Code of Civil Procedure section 580b states as follows: "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to the vendor to secure payment of the balance of the purchase price of real property, or under a deed of trust, or mortgage, on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of such dwelling occupied, entirely or in part, by the purchaser."

In their case-in-chief, respondents called an expert on real estate loan transactions and he testified that in a double escrow transaction, as here, where the buyers receive money from one of the escrows as a loan, it is a so-called "hard cash" transaction as compared to a "purchase money" transaction. The court made a specific finding that this was a hard money transaction and therefore did not fall within the antideficiency statute. Respondents argue on appeal that this "hard money" transaction was a "construction loan" to the appellants and therefore does not fall within the antideficiency statute. There is authority for this proposition in the case of

*Paramount Sav. & Loan Assn.* v. *Barber* (1968) 263 Cal.App.2d 166 [69 Cal.Rptr. 390]. However, the result in this case does not turn on the issue of whether this was a "hard money" transaction or a "purchase money" transaction.

■ A recognized exception to the antideficiency statute is a suit for fraud. This applies even when the transaction is a "purchase money" transaction. The case of *Joanaco Projects, Inc.* v. *Nixon & Tierney Constr. Co.* (1967) 248 Cal.App.2d 821 [57 Cal.Rptr. 48] is directly on point. In that case the defendant purchased two properties from the plaintiff giving plaintiff two second trust deeds on the properties to secure the two promissory notes given to plaintiff. Defendant represented to the plaintiff that he was going to build houses on the properties and persuaded the plaintiff to subordinate his trust deeds to construction loans on the properties of up to $36,000 on each property. Plaintiff did so and the construction loans were obtained and defendant only used a small amount of the proceeds obtained to construct on the properties. The construction on the properties was of inferior construction and defendant pocketed the rest of the money. Defendant then defaulted on the loans, making no payments, and the lender for the construction loans foreclosed on the properties leaving plaintiff holding his worthless second trust deeds and promissory notes. When plaintiff sued, defendant argued that because the second trust deeds were "purchase money instruments" plaintiff could not recover because of the antideficiency statutes citing Code of Civil Procedure section 580b. The trial court agreed and ruled for the defendant. However, the appellate court reversed and held that fraud had adequately been proven and thereby the statute was avoided.

This principle is also recognized by the case of *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 138-139 [135 Cal.Rptr. 802] as follows: "It is next urged that by foreclosing on its trust deed, Glendale was barred by Code of Civil Procedure sections 580b and 580d from maintaining its action for fraud against Misbin and Holmes. The contention is also nonmeritorious. [Fn. omitted.]

"The defense of sections 580b and 580d proscribing deficiency judgments is not available to the trustor as a defense to an action by the beneficiary for fraud. (See *Kass* v. *Weber* [1968] 261 Cal.App.2d 417, 422-423 . . .; *Baumrucker* v. *American Mortgage Exchange, Inc.* [1967] 250 Cal.App.2d 451, 459 . . .; *Joanaco Projects, Inc.,* v. *Nixon & Tierney Constr. Co.* [1967] *supra,* 248 Cal.App.2d 821, 824. . . .) The statutes only proscribe deficiency judgments; an action for damages for fraud is not one for a deficiency judgment."

The distinction is that a suit for fraud is a completely separate remedy than a suit on the promissory note secured by the deed of trust. This action

is not a suit on the note. This suit raises the issue of fraud in the inducement and such was found by the trial court. It would be wrong to apply a bar of recovery against plaintiff based upon a statute relating to a transaction that was fraudulently induced. To do so would be to condone the fraud. The law cannot condone such a result and it doesn't. Therefore, if there is substantial evidence to support the trial court's findings of fraud, the antideficiency statute will not prevent the judgment from standing.[1]

## THE ISSUE OF FRAUD

 The record clearly establishes that the trial court had substantial evidence upon which it could find that fraud existed and that Stewart Reed was actively involved. Civil Code section 1572 defines actual fraud. The pertinent portions are as follows: "Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

" . . . . . . . . . . . . . . . . . . . . . . . . . .

"4. *A promise made without any intention of performing it; . . .*" (Italics added.) The court made a finding that the Reeds signed the $82,500 promissory note without any intent of making payment according to the terms of the note. Substantial evidence supports this finding. The evidence also is susceptible to a finding that the Reeds never intended to utilize the "cash back" to substantially remodel or renovate the property. These are two assertions or promises made by the Reeds which can fall under either subdivision 1 or subdivision 4 of Civil Code section 1572.

In *Joanaco Projects, Inc.* v. *Nixon & Tierney Constr. Co.* (1967) *supra,* 248 Cal.App.2d at page 831, the court states: "The evidence as a whole also shows without conflict that defendants never intended to perform their contract. Even the testimony of defendant Nixon supports the view that defendants never intended to devote all or substantially all of the borrowed funds to the purposes specified in the agreement. What they did was what they had intended to do from the beginning. The promise was made without

---

[1]Appellant argues that the fraud must relate to value of the property and the evidence does not support this. We disagree. One of the representations believed by the Mansons was that substantial remodeling would be done which would increase the value of the house. Also, the fraud relating to promise to pay on the promissory note, while not relating to the value of the property, is also sufficient to avoid the bar of section 580b.

any intention to perform it. 'A promise to do something necessarily implies the *intention to perform,* and, where such an intention is absent, there is an implied misrepresentation of fact, which is actionable fraud. . . .'" (Italics in original.) ■ With regard to who may be held for the fraud, the court states: "One other point bears discussion. Although plaintiff's contract was consummated only with defendant corporation, the individual defendants Tierney and Nixon were active participants in the transaction. 'Every person connected with a fraud is liable for the full amount of the damages. Thus, individuals who are parties to the consummation of a fraud are equally responsible with the person with whom a contract induced by the fraud is made.'" (248 Cal.App.2d at pp. 832-833.)

Here, the record clearly indicates Stewart Reed signed the promissory note to the Mansons. By signing the promissory note he promised to make payments thereon. The record also contains evidence that Stewart Reed confirmed the representations made by Millie Reed regarding the intent to substantially remodel. On the witness stand Mr. Reed admitted that when he signed the note he had no intent of ever putting up any of his money to back the transactions. Also, after the Reeds defaulted, Mr. Manson called Mr. Reed and was advised that neither of the Reeds intended to make any payments on the promissory notes unless the house was resold. This is ample evidence to support the trial court's finding that the Reeds entered the transaction on a false promise made without any intent to perform.

■ Appellants also claim that the court committed reversible error for failure to make a specific finding that Stewart Reed intended to induce the Mansons to rely upon representations he made. However, a review of the findings will show that the court made the following findings: "Both Stewart Reed and Millie Reed executed a promissory note to the Plaintiffs without any intention of performing the promise to pay according to the provisions of the promissory note.

"Defendant, Stewart Reed, admitted on the witness stand under oath that when he signed the promissory note he had no intention of performing according to the provisions of the note.

". . . . . . . . . . . . . . . . . . . . . . .

"If not for Mr. Stewart Reed's actions, the whole scheme to commit fraud upon the Mansons could not have come into fruition.

"Furthermore, without the First Trust Deed having been obtained through Mr. Reed's misrepresentations, the Reeds could never have purchased the

property and received the money back under the cash-back-to-buyer transactional structure.

"Mr. Stewart Reed is a knowledgeable businessman who earns approximately $100,000.00 per year, has a net worth in excess of one million dollars, and he should have been aware of the consequences of his actions in association with Millie Reed in carrying out her scheme in connection with the Plaintiffs." While this language doesn't specifically use the words induce or intent to induce, the language clearly implies such a finding and the evidence clearly supports a finding that Stewart Reed intended to induce reliance by the Mansons. Furthermore, it is clear from the statement of decision, and the evidence in the record, that such a finding would have been adverse to the appellants in any event. The law is clearly set forth in *McAdams* v. *McElroy* (1976) 62 Cal.App.3d 985, 996 [133 Cal.Rptr. 637]: "The failure to make an express finding on a material issue is not always prejudicial. 'The failure to make a finding on an issue raised in the pleadings and supported by substantial evidence is harmless when the missing finding reasonably may be found to be implicit in other findings. The failure to find is also harmless when, under the facts of the case, the finding necessarily would have been adverse to the appellants. . . .' In short, 'Omission to find, if the judgment is otherwise supported, is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings . . . .'"

In this case, the record is clear that Stewart Reed entered the transaction to enable the transaction to proceed. He signed the promissory note for $82,500 and also lent his name to the transaction with Beverly Hills Savings & Loan knowing full well that his credit was being utilized to conclude the transaction and to facilitate both loans. There is no doubt but that he intended to induce Beverly Hills Savings & Loan and the Mansons to rely upon his name and the promise to make payments on those loans.

■ Finally, on the issue of fraud, appellants argue that the Mansons provided no evidence that they actually and reasonably relied on any representations made by Stewart Reed. However, both Mansons testified that they relied upon representations by Stewart Reed and that they would not have entered into the transaction if they had knowledge Stewart Reed would not pay on the promissory notes or that no substantial remodeling would be done. This testimony itself is sufficient to support the court's findings on that issue.

### THE PUNITIVE DAMAGE AWARD

■ Appellants only complained about the punitive damage award issued against Stewart Reed. We have already found that the judgment for fraud

against Stewart Reed is supported by substantial evidence. This being the case, appellants' argument relating to punitive damages is as nonmeritorious as in the case of *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d 101, 135. Fraud is specifically listed as a basis for award of punitive damages under Civil Code section 3294.

## THE ISSUE OF ATTORNEY'S FEES

At the close of trial, the trial court gave its intended decision from the bench. Included in the intended decision was an award of reasonable attorney's fees, the amount to be determined later according to Civil Code section 1717. Respondents filed a motion for attorney's fees and appellants filed opposition. The matter was later heard before Judge Older and he issued a minute order awarding respondents $25,000 in attorney's fees.

After the court announced its intended decision from the bench, the appellants requested a statement of decision and listed specific issues they wanted addressed. They did not include any issue relating to attorney's fees. Therefore, the court had no duty to address that issue (*Harvard Investment Co.* v. *Gap Stores, Inc.* (1984) 156 Cal.App.3d 704, 709, fn. 3 [202 Cal.Rptr. 891]). As a result, this court has no guidance on the trial court's determination of the basis for the award of attorney's fees. Similarly, no request for a statement of decision appears to have been made of Judge Older regarding his award as to the amount of attorney's fees. (See *Mabee* v. *Nurseryland Garden Centers, Inc.* (1979) 88 Cal.App.3d 420, 429 [152 Cal.Rptr. 31].) Further, appellants have not provided to this court any record relative to the proceedings before Judge Older. It is the duty of the appellant to provide appropriate documentation to the appellate court. (*Erikson* v. *Sullivan* (1947) 81 Cal.App.2d 790, 791 [185 P.2d 31].) Therefore, basically, the issue of attorney's fees is presented to this court on the judgment roll. Because of appellants' waiver of statement of decision on the issue of attorney's fees, we have no basis to review the amount awarded. If there is any legal basis from the record that supports the award of attorney's fees, then the award is appropriate.

■ Respondents' second amended complaint did include an action on the promissory note and trust deed which documents did provide for attorney's fees. Appellants, in their answer, did seek an award of attorney's fees if they prevailed. If appellants had prevailed, they would have been entitled to attorney's fees. Therefore, based upon the theory of reciprocity, the award of attorney's fees to respondents was appropriate. (*Reynolds Metals* v. *Alperson* (1979) 25 Cal.3d 124 [158 Cal.Rptr. 1, 599 P.2d 83]; *Jones* v. *Drain* (1983) 149 Cal.App.3d 484 [196 Cal.Rptr. 827].) The fact that respondents recovered under the theory of fraud instead of "on the contract" is not

important. What is important is that appellants sought and would have been entitled to recover attorney's fees had they prevailed. Appellants' reliance on *Stout* v. *Turney* (1978) 22 Cal.3d 718 is misplaced. There is no showing in that case that reciprocity was even an issue.

### THE ISSUE OF DAMAGES

The record is clear that one payment was made on the Mansons' promissory note. The trial court awarded compensatory damages of $82,500 representing the full amount of the promissory note and $44,500 in interest less $15,000 received in settlement from other defendants. The actual amount should have been $81,262.50 giving credit for one payment of $1,237.50. Also, the interest would change to $43,881.75. Therefore, the judgment should be modified to show actual damages awarded in the total amount of $110,144.25 instead of $111,500.

The matter is remanded with directions to change the amount of actual damages to reflect $81,262.50 on the note, and $43,881.75 on interest for a total of $110,144.25 (giving credit to the $15,000 received in settlement). In all other respects, the judgment is affirmed. Costs are awarded to respondents.

Feinerman, P. J., and Ashby, J., concurred.