922 F.2d 536
 59 USLW 2462, 24 Collier Bankr.Cas.2d 688,
Bankr. L. Rep. P 73,774
 In re Gus Kit FRANKLIN, a/k/a Gus Franklin, a/k/a Gus K.
Franklin, Gus K. Franklin d/b/a Allied Tree Service, Allied
Enterprises, Inc., Allied Tree and Lawn Service, and Susan
Karen Franklin, Debtors.
Gus K. FRANKLIN, et al., Appellant,
v.
COMMONWEALTH FINANCIAL CORPORATION, Appellee.
 No. 88-6224.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 9, 1990.
Decided Jan. 3, 1991.
 
 Andrew K. Mauthe, Speers, Dana, Teal & Balfour, Costa Mesa, Cal., for defendants and appellants.
 John A. Belcher, Richards, Watson & Gershon, Richard W. Labowe, Labowe, Labowe & Hoffman, Los Angeles, Cal., for plaintiff and appellee.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel.
 Before REINHARDT and LEAVY, Circuit Judges, and KING,* District Judge.
 REINHARDT, Circuit Judge:
 
 
 1
 Over 1981 and 1982, Gus Franklin d/b/a Allied Tree Enterprises ("Allied") borrowed approximately $580,000 from Commonwealth Financial Corporation ("Commonwealth"), a commercial lender. For security, in June 1981 Commonwealth obtained an interest in all of Allied's property, including accounts receivable, inventory, and equipment, with Franklin's personal guarantee of Allied's indebtedness. The amount of credit extended was based on a percentage of the accounts receivable securing the loans. In June 1982, Commonwealth also obtained a security interest in Franklin's residence, subject to prior trust deeds.[1] The deed of trust on the residence was intended partly to secure an additional loan of $28,000 and partly to serve as added security for the advances that had already been made, which totalled $536,610.27.
 
 
 2
 By June 1983, Commonwealth became aware that Franklin and his sister had fabricated most of Allied's accounts receivable.[2] Commonwealth sued Franklin, his sister, and others in a state court action for fraud, seeking judicial foreclosure. While this action was pending, a senior deed of trust holder on the Franklins' home held a foreclosure sale pursuant to a power of sale clause. On July 26, 1984, Commonwealth bought the property at this sale for $58,100.
 
 
 3
 On December 31, 1984, the Franklins filed for bankruptcy under Chapter 7 of the Bankruptcy Code. The state court proceedings were stayed and, on March 22, 1985, Commonwealth brought a nondischargeability action pursuant to 11 U.S.C. Sec. 523(a)(2), (a)(4), alleging fraudulent concealment, fraud, and misrepresentation. The Franklins moved for summary judgment. They argued that, under the bankruptcy code, a creditor may not bring a claim against a debtor if the claim is disallowed under state law. 11 U.S.C. Sec. 502. They characterized Commonwealth's nondischargeability action as an action for a deficiency judgment and claimed it was barred by California's anti-deficiency legislation. According to the Franklins, Commonwealth did not comply with California Code of Civil Procedure Sec. 580a ("Sec. 580a") in that it brought its deficiency action more than three months after the date of the foreclosure sale.[3] They further argued that Commonwealth was barred by California Code of Civil Procedure Sec. 580d ("Sec. 580d") from bringing any deficiency action because the real property at issue had been sold under a power of sale clause.[4] Commonwealth argued in response that the California anti-deficiency legislation did not apply to an action for fraud.
 
 
 4
 The bankruptcy court granted summary judgment for the Franklins. The court held that the nondischargeability action was "essentially seek[ing] a deficiency judgment" and was barred by Sec. 580a. Relying on First Fed. Sav. & Loan Ass'n v. Lehman, 159 Cal.App.3d 537, 205 Cal.Rptr. 600 (1984), the court also held that "because the alleged misrepresentations do not relate to the value of the real property itself," the allegation of fraud did not negate the bar of the anti-deficiency legislation. The Bankruptcy Appellate Panel reversed and remanded for trial, holding that California's anti-deficiency legislation, including Sec. 580a, does not provide a defense to an action for fraud.
 
 
 5
 We review a grant of summary judgment de novo. Kruso v. Int'l Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the bankruptcy court correctly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). We only consider questions relating to Sec. 580a. See n. 4 supra.
 
 
 6
 Although we find California law far less clear than did the Bankruptcy Appellate Panel, we agree that, under the circumstances of this case, the Franklins may not invoke California's anti-deficiency laws as a defense to Commonwealth's nondischargeability action. We affirm the Bankruptcy Appellate Panel.
 
 I.
 
 7
 The bankruptcy court relied on Lehman to hold that because the Franklins' fraud did not relate to the value of the real property security, Commonwealth could not avoid the bar of California's anti-deficiency legislation in its action for nondischargeability. In relying on Lehman, the court ignored a line of cases that cast substantial doubt on Lehman's continued vitality. Moreover, it applied Lehman in circumstances considerably different than those present in that case.
 
 
 8
 In Lehman, the Lehmans applied to First Federal Savings & Loan ("First Federal") for a $150,000 loan to purchase a $212,000 home. The Lehmans told First Federal that they would make a $37,000 down payment and that their secondary financing would not exceed $25,000. They also told First Federal that they would occupy the home. First Federal relied on these representations and loaned the money. Unknown to First Federal, shortly after escrow the sellers returned the Lehmans' down payment and accepted a $40,000 promissory note secured by a third deed of trust on the home. The Lehmans never lived in the house. Within a year, they sold it to new buyers, who made payments to First Federal for some time and then defaulted. First Federal initiated nonjudicial foreclosure proceedings, purchased the home at a public auction, and then discovered numerous design and construction defects. First Federal sued the Lehmans for fraudulently inducing it to lend them the $150,000 to buy the home.[5]
 
 
 9
 The Court of Appeal (District 4) held that Sec. 580d barred First Federal from seeking the equivalent of a deficiency judgment against the Lehmans. The court acknowledged language in Glendale Fed. Sav. & Loan Ass'n v. Marina View Heights Dev. Co., 66 Cal.App.3d 101, 135 Cal.Rptr. 802 (1977), that "[t]he statutes only proscribe deficiency judgments; an action for damages for fraud is not one for a deficiency judgment." Lehman, 159 Cal.App.3d at 542, 205 Cal.Rptr. at 602. Nevertheless, the court explained:
 
 
 10
 Factual analysis reveals Glendale Federal and each of the cases it cites involved alleged misrepresentations regarding or adversely affecting the value of the real property security. Allowing fraud actions for damages resulting from such misrepresentations complements the ability of beneficiaries to recover damages from trustors or third persons who tortiously injure real property security or impair the value of that security by 'bad faith' waste. However, because the Lehmans' alleged misrepresentations were totally unrelated to the value of First Federal's real property security, the rule allowing actions for fraud damages under the facts of Glendale Federal and the cases on which it relies does not apply to this case. Phrased differently, since there is no causal relationship between the alleged fraud and the damages sustained, this case does not fall within the holdings of the foregoing authorities.
 
 
 11
 Id. at 542-43, 205 Cal.Rptr. at 602-03 (citations and footnote omitted).
 
 
 12
 The case before us differs from Lehman in several significant respects. The transaction in Lehman involved a purchase money mortgage, and the home was the primary security for the loan. Here, in contrast, no purchase money mortgage is involved, and the primary security for the loan is Allied's business property, not the Franklins' home. Also unlike in the present case, the real property in Lehman was offered and accepted as security before any loan was made. Here, Commonwealth lent Franklin d/b/a Allied $536,610.27 over the course of one year before Franklin offered the deed of trust on his residence.
 
 
 13
 We also observe that no cases decided after Lehman have adopted its rationale. In Manson v. Reed, 186 Cal.App.3d 1493, 231 Cal.Rptr. 446 (1986), the Mansons sold their house to the Reeds with the understanding that Mrs. Reed would substantially remodel the house and then sell it for a profit. They relied on the advice of a broker recommended by Mrs. Reed to provide "cash back" to the buyers so that Mrs. Reed could remodel and thereby increase the value of the home. Because they had no experience with real estate transactions, they further relied on this broker to structure the deal. The Mansons sold the house for $183,000. The Reeds placed $146,400 from the original lender in escrow; the Mansons received $100,500 and a promissory note for the balance, and the Reeds received $46,000 "cash back." The note for $82,500 was secured by a second trust deed on the house. Unknown to the Mansons, however, the broker set up two separate escrows so that the original lender would not learn that the transaction involved "cash back" to the buyers. Most original lenders refuse to make loans involving "cash back." After the transaction was completed, Mrs. Reed did no substantial remodeling. She defaulted on the original loan, and the lender foreclosed and purchased the property. The Mansons were left with a worthless second trust deed and promissory note. They sued the Reeds for fraud and the Reeds asserted California Code of Civil Procedure Sec. 580b ("Sec. 580b") as a defense.[6]
 
 
 14
 The Court of Appeal (District 2) held that Sec. 580b did not bar the Mansons from suing in fraud. The court noted that "[a] recognized exception to the anti-deficiency statute is a suit for fraud." Id. at 1501, 231 Cal.Rptr. at 451. It stated:
 
 
 15
 The distinction is that a suit for fraud is a completely separate remedy than a suit on the promissory note secured by the deed of trust. This action is not a suit on the note. This suit raises the issue of fraud in the inducement and such was found by the trial court. It would be wrong to apply a bar of recovery against plaintiff based upon a statute relating to a transaction that was fraudulently induced. To do so would be to condone the fraud. The law cannot condone such a result and it doesn't. Therefore, if there is substantial evidence to support the trial court's findings of fraud, the anti-deficiency statute will not prevent the judgment from standing.
 
 
 16
 Id. at 1501-02, 231 Cal.Rptr. at 451. Without mentioning Lehman, the court then rejected the reasoning of that case: "Appellant argues that the fraud must relate to value of the property and the evidence does not support this. We disagree. One of the representations believed by the Mansons was that substantial remodeling would be done which would increase the value of the house. Also, the fraud relating to promise to pay on the promissory note, while not relating to the value of the property, is also sufficient to avoid the bar of section 580b." Id. at 1502 n. 1, 231 Cal.Rptr. at 451 n. 1 (emphasis added).
 
 
 17
 The Lehman view was again rejected in Guild Mortgage Co. v. Heller, 193 Cal.App.3d 1505, 239 Cal.Rptr. 59 (1987). In that case, the Hellers obtained a loan of $108,300 from Guild Mortgage to purchase a $129,500 home. The Hellers told Guild Mortgage that they would make a cash down payment of $21,200, that they would retain the property as an investment, and that they alone would be responsible for the mortgage payments. Guild Mortgage relied on these representations and made the loan, which was secured by a first deed of trust. When escrow closed, however, the Hellers made no down payment. They immediately transferred title to another couple, and neither they nor the new couple made payments on the mortgage. Guild Mortgage, which had sold the note to the Federal Home Loan Mortgage Corp. ("FHLMC"), was compelled by FHLMC to repurchase the property following a nonjudicial foreclosure sale in which FHLMC acquired title.[7] Guild Mortgage resold the property on the open market, suffered a loss, and sued the Hellers for fraud. The Hellers asserted Sec. 580d as a defense.
 
 
 18
 The Court of Appeal (District 2) rejected the Hellers' argument. The court stated:
 
 
 19
 A suit for fraud obviously does not involve an attempt to recover on a debt or note. As such, it stands separate and apart from any action which the antideficiency legislation seeks to preclude.
 
 
 20
 Neither the purpose nor intent of the antideficiency statutes is frustrated by allowing a creditor to recover damages for fraud in the inducement of a loan. We cannot believe that the Legislature intended to immunize a mortgagor from liability for any and all misrepresentations concerning his financial stability or plans for the property made in obtaining a loan in the first instance. Nor do we read Lehman as being that persuasive.
 
 
 21
 Id. at 1512, 239 Cal.Rptr. at 63-64 (emphasis added).[8] The court concluded that "plaintiff may prosecute its action for fraud in the inducement of the loan even though the purported misrepresentations did not directly relate to the value of the property securing the debt." Id. at 1514, 239 Cal.Rptr. at 65 (emphasis added).
 
 
 22
 In Lassar & Gross Int'l v. Dunham, 196 Cal.App.3d 496, 241 Cal.Rptr. 854 (1987), the Court of Appeal (District 2) again distanced itself from Lehman. In that case, Dunham was a real estate broker who participated in a scheme to sell condominium units at inflated prices to reflect fictitious cash down payments. Dunham provided buyers who falsely claimed that they would occupy the units. The buyers delivered promissory notes to an institutional lender and also to the seller. The seller's notes were secured by second deeds of trust in an amount at least equal to the fictitious cash down payments. Dunham and the seller then sold the second deeds of trust at a discount to third parties. Lassar & Gross purchased a second deed of trust for $20,000 after the seller falsely claimed that the condominium unit was owner-occupied and that the owner had an equity in the unit of approximately $33,550. The owner defaulted under the first deed of trust and the institutional lender foreclosed. Lassar & Gross was left with a worthless second deed of trust. It sued for fraud. Dunham asserted Sec. 580b and Sec. 580d as a defense.
 
 
 23
 The Court of Appeal held that the suit was not barred. Although it did not flatly reject the reasoning of Lehman, it took pains to distinguish the circumstances of the case before it. First, the court stated that there was a "practical and substantial difference" between fraudulently induced purchase money loans and fraudulently induced purchases of second trust deed notes. Id., 196 Cal.App.3d at 500, 241 Cal.Rptr. at 856.
 
 
 24
 While there may be a few exceptions, most "purchase money" lenders are institutions or sometimes individuals that independently appraise the property before making the loan.... We would agree that prudent second trust deed note buyers should also be knowledgeable of the value of the property securing the loan. A foreclosure on a purchase money first trust deed note can extinguish a note secured by a second deed of trust. However, it is now common knowledge that second trust deed notes are highly negotiable and are sold in large numbers. This is not nearly so prevalent with "purchase money" first trust deed notes. The buyers of second trust deed notes do not generally obtain independent appraisals of the property securing the notes as the original lenders do. This cost factor alone would act as a deterrent to the trading of these notes. We are not condoning this practice but are merely disclosing one of the practical distinctions between the safety margins of a first trust deed note and a second trust deed note. This distinction becomes important even crucial when we consider the facts of this case and the facts of Lehman.
 
 
 25
 Id. at 500-01, 241 Cal.Rptr. at 856 (citation omitted).
 
 
 26
 The court then focused on the facts.
 
 
 27
 Clearly, the scheme or conspiracy alleged by appellant in its complaint was designed to mislead the purchasers of second trust deed notes as to their value. The greater the investment by the buyer of the property (represented by the down payment) the better the security. Occupancy of the property by the original owner generally insures proper maintenance which helps to preserve the property value. It is therefore apparent that the misrepresentations alleged by appellant did pertain to the value of the second trust deed notes.
 
 
 28
 Id. at 501, 241 Cal.Rptr. at 856. The court did not directly acknowledge that these same facts existed in Lehman. There, too, the buyer falsely claimed to have made a down payment and falsely claimed that the property would be owner-occupied. The Lassar & Gross court reconciled these similarities by observing: "Evidence was presented by appellant to the trial court that the fraudulent representations would have a greater adverse effect on second trust deed notes than on first trust deed notes. We thus see a causal connection between the alleged misrepresentations and the sales of the second trust deed notes." Id.
 
 
 29
 Finally, the court noted "another compelling reason" for allowing Lassar & Gross's suit to proceed. "If we allow the anti-deficiency statutes to become a shield to this type of fraudulent scheme similar conspiracies will multiply overnight." Id. at 501, 241 Cal.Rptr. at 856-57. For all these reasons, the court concluded that Lehman did not control. It then added that, "[s]hould ... an argument be made that the reasoning of Lehman equally applies to second trust deed notes, we believe Lehman has now been modified so that it has little applicability to fraud cases." Id. at 501, 241 Cal.Rptr. at 857.[9]
 
 
 30
 The Manson, Guild Mortgage, and Lassar & Gross line of cases raises the question whether the Lehman rationale would be adopted by the California Supreme Court.[10] The Franklins argue that the more recent cases are irrelevant because Manson, Guild Mortgage, and Lassar & Gross interpreted Sec. 580b and Sec. 580d, while the case before us involves a defense based on Sec. 580a. This argument has little merit. Sections 580b and 580d involve absolute prohibitions on deficiency judgments, while Sec. 580a permits deficiency judgments in certain instances. That Sec. 580a is more permissive than Sec. 580b and Sec. 580d suggests that the California Supreme Court would be more--not less--likely to permit an action for fraud in the face of Sec. 580a than it would be when confronted with the absolute bar of Sec. 580b or Sec. 580d.
 
 
 31
 Despite the post-Lehman line of cases, it is far from clear that Lehman is no longer good law. Lassar & Gross took pains to distinguish it. More important, we note that Lehman was decided by the Fourth District, while all the subsequent cases were decided by the Second District. It is therefore possible that the conflict between Lehman and the subsequent cases represents no more than a disagreement over the law between two districts. However, we need not determine the actual basis of the conflict in order to decide the case before us. Our role is to determine what the California Supreme Court would hold if it were faced with the issue we must resolve. See Gearhart v. Uniden Corp. of America, 781 F.2d 147, 149 (8th Cir.1986) (discussing principles of Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). We can do that by basing our decision on the narrow facts before us and not attempting to resolve broad questions of general applicability, such as the issue of the continued vitality of Lehman. We find this approach particularly appealing here, not only because California case law appears to be in a somewhat confused state, but also because recent legislative enactments have complicated the question even further.
 
 
 32
 Both parties suggest that we should be influenced by legislation adopted subsequent to the events in this case. In 1985, the California legislature enacted Financial Code sections 779, 7459, 7460, and 15102. These statutes permit banks, savings and loan associations, and credit unions to sue borrowers for fraudulently induced loans secured by interests in real property. However, they do not permit such actions in the case of "loans secured by single-family, owner-occupied residential real property, when the property is actually occupied by the borrower as represented to the lender in order to obtain the loan and the loan is for an amount of one hundred fifty thousand dollars ($150,000) or less, as adjusted annually...." Cal.Fin.Code Secs. 779(b), 7460(b), 15102(b). Nor do the statutes on their face say anything about other types of lenders.
 
 
 33
 In our view, the recent legislation does not reveal anything about the law in existence prior to its passage. It also raises as many questions as it answers regarding the proper treatment of lenders not expressly covered by the statutes. We cannot simply accept the Second District's view that all lenders are probably covered, see Guild Mortgage, 193 Cal.App.3d at 1513 n. 9, 239 Cal.Rptr. at 64 n. 9, because this view appears to be contrary to the plain language of the statutes. In any event, we expressly decline Commonwealth's invitation to interpret the statutes as showing "a California legislative intent to bar anti-deficiency defenses to fraud actions." We similarly refuse to adopt the Franklins' interpretation that "it is clear that the exception created by Financial Code Sec. 779 was a change in existing law."
 
 II.
 
 34
 The facts that influence our decision here bear repeating: The real property security involved in this case was not a part of the original loan transaction. By the time Commonwealth obtained an interest in the Franklins' home, Franklin d/b/a Allied had already borrowed $536,610.27. These earlier loans had been secured by an interest in Allied's business property, with Franklin's personal guarantee of Allied's indebtedness. The deed of trust in the Franklins' home did not become a part of the loan transaction until one year after Commonwealth began lending Franklin substantial sums of money. The deed was intended to serve as added security for the loans that had already been made, as well as to secure an additional loan of $28,000.
 
 
 35
 It is evident that the interest in the Franklins' home was never intended to be Commonwealth's major source of security. Instead, the deed of trust was a small part of a business transaction that had already been in existence for one year. To permit Franklin to insulate himself from extensive liability simply because, one year after fraudulently initiating a series of loans, he offered his home as additional security, "would be to condone the fraud." See Manson, 186 Cal.App.3d at 1502, 231 Cal.Rptr. at 451.
 
 
 36
 We are influenced by the fact that the transaction did not involve a purchase money mortgage. California's anti-deficiency laws, while covering all obligations secured by an interest in real property, have historically been most protective of borrowers when the real property is security for a purchase money mortgage. See Cal.Civ.Pro.Code Sec. 580b. This case does not implicate the special policy of protecting purchase money mortgagors from losing all their assets following a foreclosure sale.
 
 
 37
 Under these circumstances, we think it clear that the California Supreme Court would not limit Commonwealth to recovery on the real property security alone, would not conclude that Lehman--even if it accepted that case's underlying principles--bars further proceedings in the matter, and would allow Commonwealth to maintain an action for fraud, notwithstanding the fact that the fraudulent representations did not relate to the value of the real property security. Our holding in this case relates to Sec. 580a, the only section at issue, and should not be taken in any way as an expression of our views regarding Sec. 580b.
 
 
 38
 We affirm the Bankruptcy Appellate Panel and remand for further proceedings consistent with this opinion.
 
 
 39
 AFFIRMED AND REMANDED.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge, District of Hawaii, sitting by designation
 
 
 [1]
 Susan Franklin joined her husband in conveying this interest
 
 
 [2]
 Franklin later admitted that the businesses identified on the purchase orders and invoices were nonexistent, and that the signatures had been forged. He stipulated to these facts at a Rule 2004 examination conducted during his bankruptcy proceedings
 
 
 [3]
 Section 580a provides in relevant part:
 Whenever a money judgment is sought for the balance due upon an obligation for the payment of which a deed of trust or mortgage with power of sale upon real property or any interest therein was given as security, following the exercise of the power of sale in such deed of trust or mortgage, the plaintiff shall set forth in his complaint the entire amount of the indebtedness which was secured by said deed of trust or mortgage at the time of sale, the amount for which such real property or interest therein was sold and the fair market value thereof at the date of sale and the date of such sale.... The court may render judgment for not more than the amount by which the entire amount of the indebtedness due at the time of sale exceeded the fair market value of the real property or interest therein sold at the time of sale with interest thereon from the date of the sale; provided, however, that in no event shall the amount of said judgment, exclusive of interest after the date of sale, exceed the difference between the amount for which the property was sold and the entire amount of the indebtedness secured by said deed of trust or mortgage. Any such action must be brought within three months of the time of sale under such deed of trust or mortgage....
 
 
 [4]
 Section 580d provides in relevant part: "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property hereafter executed in any case in which the real property has been sold by the mortgagee or trustee under power of sale contained in such mortgage or deed of trust."
 On appeal, the Franklins no longer rely on Sec. 580d. It is clear that Sec. 580d does not apply to a junior lienor who purchases at a foreclosure sale. Walter E. Heller Western, Inc. v. Bloxham, 176 Cal.App.3d 266, 221 Cal.Rptr. 425 (1985). However, Sec. 580a does. Bank of Hemet v. United States, 643 F.2d 661, 669 (9th Cir.1981).
 
 
 [5]
 The complaint also alleged negligence, strict liability, and breach of warranty
 
 
 [6]
 Section 580b provides in relevant part:
 No deficiency judgment shall lie in any event after a sale of real property or an estate for years therein for failure of the purchaser to complete his or her contract of sale, or under a deed of trust or mortgage given to the vendor to secure payment of the balance of the purchase price of that real property or estate for years therein, or under a deed of trust or mortgage on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of that dwelling occupied, entirely or in part, by the purchaser.
 
 
 [7]
 FHLMC regulations permit it to require a mortgage broker to repurchase a note when a party involved in the mortgage transaction has made false statements in connection with the transaction. See Guild Mortgage, 193 Cal.App.3d at 1509 n. 3, 239 Cal.Rptr. at 61 n. 3 (quoting FHLMC, Sellers' and Servicers' Guide Secs. 0512, 6208(a))
 
 
 [8]
 We note that the Bankruptcy Appellate Panel opinion inadvertently misquoted Guild Mortgage, quoting the final sentence: "Nor do we read Lehman as being that persuasive." In re Franklin, 87 B.R. 93, 97 (Bankr. 9th Cir.1988) (emphasis added)
 
 
 [9]
 In explaining why it believed Lehman had been modified, the court referred to recent legislation that eliminates the applicability of anti-deficiency legislation to some suits for fraud. We consider this legislation infra
 
 
 [10]
 The most recent Court of Appeal decision to discuss the validity of anti-deficiency legislation as a defense to an action for fraud is Commonwealth Mortgage Assurance Co. v. Superior Court, 211 Cal.App.3d 508, 259 Cal.Rptr. 425 (1989) (District 2). This case, which was not decided until after the Bankruptcy Appellate Panel issued its decision, involved the Sampsons' purchase of three condominium units. The Sampsons made allegedly false statements in their loan application regarding their gross monthly income, and they allegedly lied when they represented that they had not borrowed money for the down payment and that they had never had property sold through foreclosure. They obtained purchase money loans of $612,000 from a bank, which demanded policies of mortgage guarantee insurance. Commonwealth Mortgage Assurance Co. ("CMAC") issued these policies and the Sampsons agreed to protect CMAC from all losses. Several months later, the Sampsons defaulted on their loan. The bank foreclosed and its assignee purchased the property at the foreclosure sale for the total amount of the unpaid mortgage plus costs. The assignee then collected approximately $175,000 from CMAC pursuant to the insurance policies. CMAC sought reimbursement from the Sampsons, who refused to perform. CMAC sued for fraud, claiming that the Sampsons had made false statements in their loan application for the purpose of inducing CMAC to provide mortgage guarantee insurance. The Sampsons asserted Sec. 580d as a defense
 The Court of Appeal examined whether CMAC had stated a cause of action for fraud. Because the creditor had made a successful full credit bid for the property, the court held that the creditor was left with no deficiency, had suffered no damages, and had no right to collect under an insurance policy. Id. at 520, 259 Cal.Rptr. at 432. Therefore, CMAC's decision to pay on the insurance policy had no causal connection to the Sampsons' alleged misrepresentations. CMAC had no cause of action for fraud.
 In dicta, the Commonwealth Mortgage court distinguished the facts from Guild Mortgage. The court stated that, unlike in Guild Mortgage, the plaintiff had not shown "that its payment of the claims was necessitated by or caused by the [defendant's] alleged fraud." Id. at 521, 259 Cal.Rptr. at 432. It did not dispute Guild Mortgage's assertion that Lehman has been discredited by recent legislation. Id. at 519, 259 Cal.Rptr. at 431 (citing Guild Mortgage, 193 Cal.App.3d 1505, 239 Cal.Rptr. 59). Further, it expressly declined to decide whether that legislation, although not explicitly covering CMAC, should afford CMAC a cause of action for fraud in the inducement of the insurance policies. Id. at 520, 259 Cal.Rptr. at 431.