[No. B022174. Second Dist., Div. Two. Aug. 5, 1987.]

GUILD MORTGAGE COMPANY, Plaintiff and Appellant, v.
JACK H. HELLER et al., Defendants and Respondents.

## COUNSEL

Dorazio, Barnhorst & Bonar, Joel L. Incorvaia and Martha O. Anderson for Plaintiff and Appellant.

Landels, Ripley & Diamond, Bruce W. Hyman, Harvey L. Leiderman and Susan T. Taylor as Amici Curiae on behalf of Plaintiff and Appellant.

Nordman, Cormany, Hair & Compton and Glen M. Reiser for Defendants and Respondents.

**OPINION**

**COMPTON, J.**—Plaintiff Guild Mortgage Company appeals from a judgment dismissing its complaint for breach of contract, fraud, and conspiracy after the trial court sustained without leave to amend the demurrer of defendants Jack and Kathleen Heller. We reverse.

■ On appeal from a judgment entered after the sustaining of a general demurrer, this court must assume the truth of all properly pleaded allegations of the complaint. (*Loehr* v. *Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1076-1077 [195 Cal.Rptr. 576].) Moreover, the allegations must be liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452; *King* v. *Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].) Our primary task is to determine whether the facts alleged provide the basis for a cause of action against defendants under any theory. (*Katona* v. *County of Los Angeles* (1985) 172 Cal.App.3d 53, 56 [218 Cal.Rptr 19]; *Surina* v. *Lucey* (1985) 168 Cal.App.3d 539, 541 [214 Cal.Rptr. 509].)

For purposes of this appeal, a brief recital of the facts is all that is required. In September 1983, defendants agreed to purchase a single-family residence in Agoura Hills from Arthur and Francene Johnson for $129,500. The parties opened escrow and defendants applied to Guild Mortgage for a $108,300 loan to be secured by a first trust deed on the property. Although the escrow instructions were amended on several different occasions, they essentially provided that defendants would make a cash down payment of $21,200 and pay the usual closing costs and charges. Defendants further represented to Guild that the property would be retained as an investment and that they alone would be responsible for making the monthly mortgage payments. Based upon these various representations, the loan was made in December 1983. Escrow closed shortly thereafter without defendants being required to make a down payment or paying closing costs. ■ ■ Unaware that defendants had assumed ownership without complying with the escrow instructions, Guild Mortgage sold the note on the secondary mortgage market to the Federal Home Loan Mortgage Corporation (FHLMC).[1]

---

[1] The secondary mortgage market is "a vehicle for linking the mortgage market with the broader capital market; secondary market transactions can involve two private lenders, a private lender and a government-sponsored secondary market agency [e.g. Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation], or a private lender and a private conduit company." (Edson & Jacobs, The Secondary Mortgage Market Guide (1986) § 1.03, at p. 1-12.) As used here, the term "secondary market" refers to the sequence in which lenders acquire the first lien and then sell the note at a discount to a private or public investor. (Augustine & Zarro, Cal. Real Estate Law and Practice (1986) § 100.11, at pp. 100-117.)

Immediately following the close of escrow defendants transferred title to Ray and Marianne Lake, both of whom were then renting or leasing the property from the Johnsons. Defendants subsequently received a payment in excess of $8,000 from the broker, one Frederic Burton, who had arranged the sale of the home.[2] Neither defendants nor the Lakes made payment on the loan and the FHLMC initiated nonjudicial foreclosure proceedings under the first trust deed and acquired title to the property. Subsequently, the FHLMC compelled plaintiff to repurchase the property.[3] In reselling the property on the open market plaintiff suffered a loss in excess of $50,000. Guild Mortgage later brought this action, seeking both general and punitive damages, against the Hellers, the Johnsons, the Lakes, Burton, and Townsgate Escrow, among others.[4]

██ ██ In urging us to affirm the trial court's order sustaining their demurrer without leave to amend, defendants make the same contention they made below, that is, that the cause of action plaintiff attempted to set forth is barred by the provisions of Code of Civil Procedure section 580d providing, in pertinent part, that "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust . . . upon real property . . . in any case in which the real property has been sold by the . . . trustee under power of sale contained in such . . . deed of trust."[5] Plaintiff, on the other hand, argues that the action against defendant is not upon a promissory note but is a common law action for fraud, and section 580d does not bar its recovery in this action.

In sustaining the demurrer the trial court relied in great part on *First Federal Sav. & Loan Assn.* v. *Lehman* (1984) 159 Cal.App.3d 537 [205

---

[2] The complaint further alleges that prior to the purchase of the property Burton was indebted to defendants for approximately $9,000.

[3] Under stringent FHLMC regulations, the agency may require a mortgage broker to repurchase the note when "[t]he borrower(s) or any other party in the mortgage transaction has made false representations in conjunction with such transaction, whether or not the Seller [i.e., the mortgage broker] was a party to or had knowledge of such false representations." (See FHLMC Sellers' & Servicers' Guide, §§ 0512, 6208(a).) The repurchase price includes the following: "[FHLMC's] participation interest in the unpaid principal balance of the mortgage, including negative amortization on adjustable-rate mortgages . . . ; accrued interest thereon at the required net yield in effect as of the beginning of the month of repurchase through the day before the repurchase date, this date being the date funds are remitted to [the FHLMC] . . . ; [and] reimbursement to [the FHLMC] for loss, damage, or expense, including court costs and reasonable attorney's fees incurred by [the FHLMC] in connection with its purchase, ownership, and resale to the Seller of its participation interest in the mortgage." (§ 6208(c).)

[4] All defendants, except of course the Hellers, apparently remain parties to the instant action below.

[5] A deficiency judgment awards recovery of the unpaid principal and interest on the secured debt plus the costs, fees, and other expenses of foreclosure. (1 Miller & Starr, Current Law of Cal. Real Estate (rev. ed. 1975) § 3:145, p. 582.)

Cal.Rptr. 600]. In that case, the defendant borrowers secured a purchase money loan from plaintiff savings and loan after misrepresenting their intent to occupy the premises, the amount of a cash down payment, and the extent of secondary financing. The defendants treated the residence as investment property and, although they made payments on the loan for a period of time, eventually sold the property to a third party who defaulted on the loan. Following a nonjudicial foreclosure, the lender sought damages for fraud against the original purchaser. The Court of Appeal held that the action was, in effect, an attempt to recover a deficiency since the plaintiff sought to recover the unpaid balance of the loan less the amount bid at the foreclosure sale. In so holding, the court refused to follow those cases which permit actions for fraud relating to the value of the real property security, and found that under the circumstances there was no causal connection between the alleged fraud and the lender's damages. The court thus concluded that the action was barred by Code of Civil Procedure section 580d.

■ In California, as in most states, a creditor's right to enforce a debt secured by a mortgage or deed of trust on real property is restricted by statute. Under California law "the creditor must rely upon his security before enforcing the debt. (Code Civ. Proc., §§ 580a, 725a, 726.)[6] If the security is insufficient, his right to a judgment against the debtor for the deficiency may be limited or barred by sections 580a, 580b, 580d, or 726 of the Code of Civil Procedure." (*Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 38-39 [27 Cal.Rptr. 873, 378 P.2d 97].) Prior to the enactment of section 580d in 1939, however, a creditor, except in purchase money trans-

---

[6] Code of Civil Procedure section 580a provides in part: "Whenever a money judgment is sought for the balance due upon an obligation for the payment of which a deed of trust or mortgage with power of sale upon real property or any interest therein was given as security, following the exercise of the power of sale in such deed of trust or mortgage, the plaintiff shall set forth in his complaint the entire amount of the indebtedness which was secured by said deed of trust or mortgage at the time of sale, the amount for which such real property or interest therein was sold and the fair market value thereof at the date of sale and the date of such sale. . . . The court may render judgment for not more than the amount by which the entire amount of the indebtedness due at the time of sale exceeded the fair market value of the real property or interest therein sold at the time of sale with interest thereon from the date of the sale; provided, however, that in no event shall the amount of said judgment, exclusive of interest after the date of sale, exceed the difference between the amount for which the property was sold and the entire amount of the indebtedness secured by said deed of trust or mortgage. . ."

Code of Civil Procedure section 725a provides in part: "The beneficiary or trustee named in a deed of trust or mortgagee named in a mortgage with power of sale upon real property or any interest therein to secure a debt or other obligation . . . shall have the right to bring suit to foreclose the same in the manner and subject to the provisions, rights and remedies relating to the foreclosure of a mortgage upon such property."

Code of Civil Procedure section 726 states in relevant part: "(a) There can be but one form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property, which action must be in accordance with the provisions of this chapter. . . ."

actions,[7] could obtain a deficiency judgment against his debtor after private sale of real property given to secure an obligation. (Code Civ. Proc., § 580a.) The deficiency judgment, whether after private or judicial sale, was limited to the difference between the amount of the indebtedness and the fair market value at the time of the sale. (Code Civ. Proc., §§ 580a, 725a et seq.)

The purpose of the antideficiency legislation was to protect debtors in certain situations from personal liability for large deficiency judgments after their property had been taken by the creditor through foreclosure proceedings, thereby preventing the aggravation of the economic downturn which would result if defaulting purchasers lost their land and in addition were burdened with personal liability (*Bargioni* v. *Hill* (1963) 59 Cal.2d 121, 123 [28 Cal.Rptr. 321, 378 P.2d 593].) The antideficiency statutes further served to prevent creditors in private sales from buying in at deflated prices and realizing double recoveries by holding debtors for large deficiencies. (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 601 [125 Cal.Rptr. 557, 542 P.2d 981]; *Spangler* v. *Memel* (1972) 7 Cal.3d 603, 612 [102 Cal.Rptr. 807, 498 P.2d 1055]; see also Hetland, Secured Real Estate Transactions (Cont.Ed.Bar 1974) § 9.3, pp. 183-184.) The Supreme Court also has observed that "section 580d was enacted to put judicial enforcement on a parity with private enforcement. This result could be accomplished by giving the debtor a right to redeem after a sale under the power. The right to redeem, like proscription of a deficiency judgment, has the effect of making the security satisfy a realistic share of the debt. [Citation.] By choosing instead to bar a deficiency judgment after private sale, the Legislature achieved its purpose without denying the creditor his election of remedies. If the creditor wishes a deficiency judgment, his sale is subject to statutory redemption rights. If he wishes a sale resulting in nonredeemable title, he must forego the right to a deficiency judgment. In either case the debtor is protected." (*Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d at pp. 43-44.)

As can be seen, the antideficiency statutes embrace a complete legislative scheme for foreclosure for defaulted debts. ▉ It has long been recognized, however, that those statutes do not preclude a suit for fraud. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101 [135 Cal.Rptr. 802]; *Kass* v. *Weber* (1968) 261 Cal.App.2d

---

[7] Code of Civil Procedure section 580b, enacted in 1933, barred deficiency judgments altogether on purchase money mortgages. That statute provides in relevant part: "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to the vendor to secure payment of the balance of the purchase price of real property, or under a deed of trust, or mortgage, on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of such dwelling occupied, entirely or in part, by the purchaser."

417 [67 Cal.Rptr. 876]; *Baumrucker* v. *American Mortgage Exchange, Inc.* (1967) 250 Cal.App.2d 451 [58 Cal.Rptr. 677]; *Joanaco Projects, Inc.* v. *Nixon & Tierney Constr. Co.* (1967) 248 Cal.App.2d 821 [57 Cal.Rptr. 48]; *Pastor* v. *Younis* (1965) 238 Cal.App.2d 259 [47 Cal.Rptr. 684].)

Section 725a specifically refers to recovery on a "debt" while section 580d specifically refers to judgments on a deficiency on a "note." There is, therefore, nothing in the express language of the statutes which precludes an action not involving recovery on a debt or note. (See *Kass* v. *Weber, supra,* 261 Cal.App.2d at pp. 422-423, see also *Manson* v. *Reed* (1986) 186 Cal.App.3d 1493 1500-1502 [231 Cal.Rptr. 446].) A suit for fraud obviously does not involve an attempt to recover on a debt or note. As such, it stands separate and apart from any action which the antideficiency legislation seeks to preclude.

Neither the purpose nor intent of the antideficiency statutes is frustrated by allowing a creditor to recover damages for fraud in the inducement of a loan. We cannot believe that the Legislature intended to immunize a mortgagor from liability for any and all misrepresentations concerning his financial stability or plans for the property made in obtaining a loan in the first instance. Nor do we read *Lehman* as being that pervasive.

Allowing plaintiff here to prosecute its claim and receive compensation for its damages will not result in a downward spiral of land values, double recovery, or overvaluation of security. The risk inherent in secured land transactions will remain with the mortgagee, but that risk should not be expanded to include the assumption of damages resulting from a mortgagor's fraud. (See *Brown* v. *Critchfield* (1980) 100 Cal.App.3d 858, 870-871 [161 Cal.Rptr. 342].)

The financial qualifications of the mortgagor and the use to which the property is to be put are vital considerations in extending credit and are appropriate gauges of the probability of default.

■ In 1985, the Legislature, intending to curtail fraud in the real estate market and to vitiate the holding in *Lehman* enacted Finance Code sections 779, 7459, 7460, and 15102.[8] Under these statutes, banks, savings and loan

---

[8] Financial Code section 779 provides as follows: "(a) Notwithstanding Section 726 of the Code of Civil Procedure or any other provision of law to the contrary, a state or nationally chartered bank, its subsidiaries or affiliates transacting business in this state, or any successor in interest thereto, that originates, acquires, or purchases, in whole or in part, any loan secured directly or collaterally, in whole or in part, by a mortgage or deed of trust on real property, or any interest therein, may bring an action for recovery of damages, including exemplary damages not to exceed 50 percent of the actual damages, against a borrower where the ac-

associations, and credit unions may now maintain an action for damages, including punitive damages not exceeding 50 percent of actual damages, against a borrower based on fraud when the conduct induced the lender to make a real estate loan. To avoid any ambiguity, such actions are expressly excepted from the antideficiency provisions of Code of Civil Procedure sections 726, 580a, 580b, and 580d. Because of evidence that fraud was most prevalent in loans for large, single-family dwellings, multiple-unit dwellings and commercial property, the legislation exempted loans secured by single-family residential real property, when the property is *actually occupied by the borrower* and the loan is for $150,000 or less.[9]

The legislative history[10] of these various enactments makes clear the Legislature's disapproval of the judicial use of the antideficiency statutes to insulate mortgagors from liability in fraudulently induced loan transactions. We also think it obvious that the public policies served by the antideficiency statutes are in no way frustrated by permitting a lender to pursue a separate action against a borrower for fraud. The statutes essentially allow an action for fraud in those situations where a creditor-mortgagee would have been able to obtain a deficiency judgment following a judicial foreclosure. The damages recoverable in such actions remain a matter of proof and will be

---

tion is based on fraud under Section 1572 of the Civil Code and the fraudulent conduct by the borrower induced the original lender to make that loan.

"(b) The provisions of this section shall not apply to loans secured by single-family, owner-occupied residential real property, when the property is actually occupied by the borrower as represented to the lender in order to obtain the loan and the loan is for an amount of one hundred fifty thousand dollars ($150,000) or less, as adjusted annually commencing on January 1, 1987, to the Consumer Price Index as published by the United States Department of Labor.

"(c) Any action maintained under this section for damages shall not constitute a money judgment for deficiency or a deficiency judgment within the meaning of Section 580a, 580b, or 580d of the Code of Civil Procedure."

Financial Code section 7460 tracks the language of section 779 and is made applicable to state and federally chartered savings and loan associations. Section 15102 extends the same protections to credit unions and their affiliates.

Financial Code section 7459 provides as follows: "In addition to establishing reserves pursuant to Section 6476, an association or federal association, as defined in Section 5102, may establish a separate loan reserve account regarding losses resulting from fraud by a borrower and may recover any of those losses from that borrower."

[9] Plaintiff, a mortgage banker and not a state or federally chartered bank, savings and loan or credit union, is technically not embraced in the new legislation. Nothing in the legislative history indicates any reason for the failure to include mortgage bankers, such as the plaintiff, or private lenders who make real estate loans and who are probably less able to protect themselves against fraud than are the enumerated institutions.

Since the present action, however, was filed prior to the effective date of the legislation, we need not decide the impact of that legislation on future actions by such lenders.

[10] Pursuant to plaintiff's request and its submission of the legislative materials related to the passage of the statutes, we have taken judicial notice of evidence indicative of the Legislature's intent in enacting Financial Code sections 779, 7459, 7460, and 15102. (See Evid. Code, §§ 452, subd. (c) and 459.)

limited to the extent a lender can establish it was harmed by the fraudulent misrepresentation. The mortgagor, therefore, retains the protection of the antideficiency statutes in all instances except those involving fraud.

■ In light of the foregoing, we are convinced that plaintiff may prosecute its action for fraud in the inducement of the loan even though the purported misrepresentations did not directly relate to the value of the property securing the debt.

Defendants nonetheless argue that such an action may not be maintained in the absence of any allegation that the property was sold at auction for less than the amount of the outstanding debt. Their argument is premised on the notion that a lender may not seek damages for fraud, whether or not that fraud relates to the valuation of the property held as security, where it has made a "full credit bid" at the trustee's sale. According to defendants, such a bid establishes as a matter of law that the value of the underlying security has not been impaired and results in the total satisfaction of the secured obligation. (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590, 607-608; *Sumitomo Bank* v. *Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211, 218-220 [229 Cal.Rptr. 719].)[11]

Although the respective briefs devote considerable time to the the legal and practical effect of a full credit bid on plaintiff's cause of action,[12] we need not resolve that issue on this appeal. Regardless of whether the FHLMC purchased the property by making a full credit bid, the complaint avers that plaintiff Guild Mortgage and not the FHLMC was damaged in an amount exceeding $50,000 when it was required to repurchase and sell the property on the open market. The complaint further alleges that the repurchase was necessitated by defendants' fraud and that the loan would not have been made in the absence of the purported misrepresentations. Even under the rule articulated in *Lehman,* these allegations are sufficient to establish a clear causal connection between defendants' alleged fraudulent conduct and the damages sustained.

Even were we to hold that plaintiff could not maintain a separate cause of action for fraud against defendant-buyers, we would nonetheless conclude that the lender is entitled to proceed against defendants under the conspiracy allegation. That allegation essentially avers that the buyer, seller, broker, escrow company, and transferee conspired among themselves to secure the

---

[11] Pursuant to defendants' request, we have taken judicial notice (Evid. Code, §§ 452, subd. (d), 459) of the amicus brief filed in *Sumitomo Bank* v. *Taurus Developers, Inc., supra.* That brief traces the development and application of the full credit bid rule in California.

[12] Plaintiff's complaint does not indicate the price paid for the property at auction or whether the FHLMC made a full credit bid.

desired loan and that each was aware of the material misrepresentations made by the Hellers to plaintiff. ■ All members of a civil conspiracy are, of course, jointly and severally liable for each other's fraudulent conduct. (See *Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063]; *Wetherton* v. *Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168, 177 [79 Cal.Rptr. 543].) ■ Since such an action involves no attempt to recover a debt or to obtain a deficiency judgment, the parties to the conspiracy, including the Hellers, may not avail themselves of the protection afforded by the antideficiency statutes.

The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed herein. Plaintiff to recover its costs on appeal.

Roth, P. J., concurred.

**GATES, J.**—I wholeheartedly concur in my colleagues' decision to reverse the judgment upon the pleadings entered *in this particular action*. I write here only to caution against too broad an interpretation being given to our holding.

Accepting as true, as we must, the allegations of appellant's complaint, respondents, acting in the role of "dummy" purchasers, joined with others in a conspiracy to perpetrate a deliberate fraud which could conceivably have caused injury even to a lender who had exercised reasonable care in the conduct of its business affairs.

This state's antideficiency statutes were never designed to allow such persons to escape the consequences stemming from their part in this joint tort while their cohorts yet remained liable. Nevertheless, I trust this fact will not be mistakenly construed by our various lending institutions and their counsel, or by our trial courts themselves, as indicating we believe the careful limitations imposed upon fraud actions by our Legislature (see Fin. Code, §§ 779, 7459, 7460 and 15102), may be ignored and open season declared on more traditional defaulting borrowers.

Our present extremely limited record, of course, reveals virtually none of the determinative events surrounding appellant's alleged loss and, as jurists, we have little pragmatic experience in this arcane field of mortgage financing. Appellant's counsel, however, did advise us at oral argument that at one point her client actually had held title to the very property which, presumably after an appropriate investigation and appraisal, it had agreed to accept, at least in the absence of a judicial foreclosure, as full satisfaction for its loan. She further stated that this period of ownership had occurred

after the Federal Home Loan Mortgage Corporation *had closed out other potential purchasers by means of a "full credit" bid.*

Were these facts not disturbing enough, counsel further informed us that thereafter, by means of some unknown private transaction that lacked even the protection provided by a trustee sale, appellant had unilaterally fixed its losses at $50,000. This sum it now seeks to recover together with an additional $50,000 by way of punitive damages. Such a scenario obviously has the potential for the gravest of abuses. (How any company can rationally expect to remain solvent when it accepts as security property worth only one-half the amount it lends, is a question we did not pose.)

Radio, television, and the newspapers, to say nothing of one's daily "junk mail," are replete with the importunities of various lenders and mortgage brokers. They assure any who will harken to their siren call that, since they are concerned solely with the ownership of property, to them it matters not that a potential borrower has been turned down by banks and savings and loan associations, that he cannot verify his income, that his credit is not established, etc., etc. In addition, it is at least rumored that certain real estate salesmen eager for a commission have been known to urge prospective purchasers to adopt "creative-financing" schemes which, should they collapse, might readily provide a superficially firm foundation for an assertion of fraud.

Rare indeed is the attorney intellectually incapable of dictating a complaint setting forth any cause of action known to the law. Although, hopefully, an inappropriately accused borrower would ultimately prevail at trial, or upon a motion for summary judgment, or even after a succession of demurrers had forced a sufficient specificity of pleading, nonetheless, such counsel provided defenses would be of little significance to a defendant too impoverished to make his mortgage payments.

In sum, while we must be ever alert to foil the type of gross fraud allegedly perpetrated here, not every factual inaccuracy or piece of "puffing" by a borrower, unrelated to the value of the security the lender has voluntarily agreed to accept, will sustain an action for fraud brought by a lender who is not a bank, savings and loan, or credit union, or even by one of these institutions upon an indebtedness of less than $150,000 incurred in connection with a single-family, owner occupied residence.

To hold otherwise would completely emasculate our long honored antideficiency statutes and render meaningless the restricted exceptions thereto our Legislature has so recently promulgated. It would also cause individual borrowers who are not, as here alleged, engaged in a conspiracy, either

(1) to bear the potentially impossible cost of a lawsuit, or (2) to continue to pay for land their lender earlier had taken unto itself by means of a full credit bid made in a nonjudicial foreclosure, and which it thereafter had disposed of in a privately conducted sale.

A petition for a rehearing was denied August 31, 1987.