[No. A079638. First Dist., Div. Four. Sept. 11, 2000.]

H. ROGER LAWLER, Plaintiff, Cross-defendant and Respondent, v. JUSTIN M. JACOBS, JR., et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.C.2. and II.B.

## COUNSEL

Justin M. Jacobs, Jr., in pro. per.; Tanke & Willemsen, Michael A. Willemsen; Moore & Associates, Robert R. Moore; Allen, Matkins, Leck, Gamble & Mallory, Robert R. Moore; Prentice & Scott, John Houston Scott and Sheila A. Reid for Defendants, Cross-complainants and Appellants.

Ropers, Majeski, Kohn & Bentley, Susan H. Handelman and Terry Anastassiou for Plaintiff, Cross-defendant and Respondent.

## OPINION

**REARDON, J.**—Two developers purchased 91 acres of raw land for $6 million down and a $3 million purchase money note secured by the real property. They agreed to waive antideficiency protection;[1] the vendor, in turn, subordinated his promissory note to that of a third party commercial lender. Upon the developers' default and the senior lender's foreclosure sale, the vendor sued for his deficiency.

In this suit and countersuit, both parties have claimed fraud. The issue of the vendor's ability to pursue a deficiency judgment was bifurcated for a court trial. Relying on *Spangler v. Memel* (1972) 7 Cal.3d 603 [102 Cal.Rptr. 807, 498 P.2d 1055] (*Spangler*), the lower court ruled that the transaction was not subject to 580b and entered an interlocutory deficiency judgment. The matter proceeded to a jury trial, with a verdict finding the developers— but not the vendor—liable for fraud.

We hold that the sales transaction came within the scope of 580b and hence reverse the judgment in favor of the vendor on his suit for fraud and breach of contract. However, we affirm the judgment rendered against the developers on their countersuit.

## I. FACTS

### A. *Whiskey Hill, 1970-1991: Purchase, Sale and Default*

Whiskey Hill is a 128- to 129-acre ranch in Woodside, San Mateo County, consisting of six lots created by an 1889 subdivision map. Respondent H. Roger Lawler purchased the property in 1970. The property was undeveloped ranch land with no improvements.

During most of the tenure of his ownership Lawler leased the property "for cattle or horses." In the early 1980's he looked into subdividing the ranch, but his plans were thwarted when the Town of Woodside (Town) downzoned the property from a three- to five-acre minimum lot size. Lawler attempted subdivision again in 1987, this time submitting an application to

---

[1] At issue here is Code of Civil Procedure section 580b (hereafter section 580b or 580b) which bars a vendor from obtaining a deficiency judgment for the unpaid purchase price secured by a trust deed on the property purchased.

subdivide the entire ranch into 23 lots. Lawler hired an architect to manage the subdivision project. In December 1987 the Town imposed a moratorium on new subdivisions, thereby halting Lawler's application process. Ultimately, the moratorium was extended to two years.

During the moratorium Lawler listed five of the six Whiskey Hill lots for sale, reserving lot 69, with 38 acres, for himself. Around that time he began constructing a home on that lot.

Lawler commissioned an appraisal of the property and also learned that in order to sell the lots he would need "certificates of compliance" from the Town. This process entailed having percolation tests performed on the property and obtaining letters from utility providers indicating that utilities would be provided to the lots being sold. The appraisal came in at $15,815,000.

Lawler had four requirements for any sale: (1) all cash; (2) property to be purchased "as is"; (3) closing to occur quickly; and (4) no contingencies.

Mike Kilroy, on behalf of LandBank, approached Lawler about purchasing the property. LandBank is a sole proprietorship owned by appellant Justin M. Jacobs, Jr., through which he managed and developed property. At the pertinent times appellant Norman E. MacKay worked for Jacobs, serving as executive vice-president and in-house legal counsel. Both Jacobs and MacKay are lawyers.

Kilroy expressed to Lawler that appellants had an interest in subdividing the property and then selling finished lots. Lawler asked Kilroy for Jacobs's financial statement. Kilroy complied. At trial he acknowledged the inference that Lawler was relying on an inability to pay.

Kilroy also discussed the listing with Lawler's broker. He learned that Lawler needed certificates of compliance from the Town on the five parcels, and found out about the moratorium. In early 1989 appellants floated several proposals to purchase the property, which Lawler rejected. They all called for Lawler carrying back the balance of the purchase price with an unsecured promissory note. One of the rejected offers conditioned payment on the note on the number of lots that appellants developed.

They ultimately submitted an option to purchase which Lawler accepted on February 7, 1989. The parties met for a couple of hours at Lawler's home that evening. The purchase price was set at $9 million, $6 million in cash with Lawler carrying back a $3 million promissory note secured by a deed of

trust on parcel 67. At Lawler's insistence, appellants agreed that Lawler would have full recourse on the note.[2] Additionally, Lawler promised to subordinate his note to an acquisition/construction loan of up to $11 million so buyers could subdivide and develop the property. At one point that evening Lawler called Attorney Mike McCracken. Lawler testified that he did not call him about enforceability of the waiver of antideficiency rights.

Meanwhile, appellants conducted their own due diligence regarding the property, including contracting for a geologic assessment, a biotic reconnaissance, an appraisal (which came in at $9.2 million), and a preliminary engineering construction cost estimate. Civil engineer Bob Field was asked to give input on the property. He expressed strong reservations about the advisability of pursuing development. He was concerned about whether the Town would allow a sanitation sewer and about some unstable soils he had seen on a map.

Appellants exercised the option on March 13, 1989. Prior to the close of escrow, appellants agreed to accept conditional certificates of compliance on the five parcels because the Town insisted on conditions related to access and provision of utilities, which appellants considered reasonable and normal. Escrow closed on June 12, 1989, without even the conditional certificates of compliance because they were not in proper form. Appellants nonetheless were satisfied that the Town would live up to its agreement to provide provisional certificates.

Lawler received $6 million in cash (including payments already made under the option agreement) and appellants' note for the $3 million balance, secured by a deed of trust on all five parcels conveyed.[3] As agreed, Lawler subordinated his security to a line of credit that appellants obtained from Commercial Center Bank (CCB) for up to $8.2 million. The CCB line of credit was for land acquisition and development, for an initial term of 18

[2]Specifically, the agreement referenced the form of promissory note, which was attached as exhibit A. Clause 8, the last paragraph of the note, was handwritten as follows: "8. Deficiency: The parties agree and intend that in the event of a default by payor hereunder of the 'first loan' resulting in a foreclosure of the 'permitted mortgage' upon Parcel 67 of the property which Parcel 67 secures this note, then payee shall be entitled to full recourse against payor without the restriction of the anti-deficiency laws, if any, so that payee may recover all monies, damages, and fees due to payee under this note."

[3]Lawler testified that he thought the note was secured only by parcel 67, as per the original plan. He contended that discrepancy in security was a title company error. MacKay testified that parcel 67 was originally selected as Lawler's security as an accommodation to the lender. However, as it turned out, the lender assumed Lawler's loan would be secured by all five lots and did not require any restriction on Lawler's security. MacKay also stated that there was no legal description available that would adequately describe the partial security, and so the parties used the legal description for the parcels sold.

months, with two additional six-month options to extend the term. $4.5 million was allotted to the purchase price of the property; $1,765,000 was set aside for "construction costs" in the form of infrastructure improvements; and $1,935,000 was set aside for "other costs," including loan costs and interest. CCB conditioned disbursement of the construction cost component of the loan on approval of a final subdivision map.

On June 12, 1989, CCB disbursed $4.5 million for land acquisition and $154,000 for loan fees. Between July 3, 1989 and December 1, 1990, CCB made periodic disbursements for interest under the loan. No funds were ever disbursed from the construction reserve because appellants never obtained final map approval.

Thereafter the developers pursued their plans to subdivide the property into 16 lots (they never intended to build homes—just to finish the lots). In November 1989, they learned that the Town was going to downzone the property again, this time to a 10-acre minimum lot size. The developers challenged the Town's downzoning and eventually settled the dispute at a 7.5-acre lot size with respect to their lots.

Following the sale to appellants, Lawler himself pursued subdivision of his retained lot 69, hiring landscape architect Richard Schwedhelm in September 1990. Verifying the status of the property at the county records office, Schwedhelm discovered that there were two different subdivision maps on file—the 1889 map and another 1890 map. The 1889 map represented 36.79 acres for lot 69; the 1890 map, 38.21 acres.

At one point Lawler instructed Schwedhelm to proceed with the 1890 map. However, the actual concept maps that were filed with the rezoning application, at Lawler's direction, were in accord with the 1889 configuration.

At a September 14, 1990 meeting attended by Lawler, MacKay and others, the differences in the two maps were discussed.

By November 1990, Lawler understood that the Town was prepared to recommend rezoning the Whiskey Hill property to 7.5 acres minimum lot size.

The developers never actually applied for a subdivision map. They stopped payments on both loans in December 1990. Lawler recorded his notice of default on January 2, 1991. CCB served its notice of default on June 26, 1991. With the property foreclosed in November with a $6 million credit bid on a total debt of $6,332,735.20, Lawler did not bid on the property and became a sold-out junior lienholder.

## B. *Litigation Commences*

On June 13, 1991, Lawler filed this action to foreclose his deed of trust and for fraud and negligent misrepresentation. With the first amended complaint he alleged that appellants never intended to honor their promise to remain personally liable on the promissory note and forego asserting the antideficiency statutes as a defense to any enforcement action. Appellants in turn cross-complained for fraud, negligent misrepresentation and breach of contract. Among other points they alleged that Lawler (1) lied about the number of lots that could be developed through subdivision and the certainty of approval by the Town, and (2) failed to disclose his knowledge or belief that the Town would never approve more than 10 to 12 lots.

Appellants moved unsuccessfully for summary judgment on grounds that Lawler's suit was barred by section 580b. Thereafter, the parties agreed to bifurcate trial, with the 580b issue tried to the court before the jury was impaneled. The trial court ruled that the "*Spangler* exception to [580b] applies to the transaction at bar and that a deficiency judgment is entered in favor of . . . Lawler . . . subject to any defenses or claims unrelated to . . . [580b] that the parties may raise . . . ." With that the court stayed the judgment until the remainder of the case was resolved.

Prior to commencement of the jury trial, Lawler moved to bar all evidence of his conversations with Attorney McCracken. The court ruled that Lawler's deposition testimony to the effect that he called McCracken and "probably" spoke with him about the waiver[4] was foundational and hence admissible, but that Lawler did not thereby waive the attorney-client privilege and thus all other evidence on that issue was inadmissible.

## C. *Jury Trial*

The jury trial proceeded on the parties' respective fraud and related claims.

### 1. *Lawler's Case*

Lawler testified that he would not have agreed to sell the property to appellants absent their representation that they would remain personally liable on the note. Kilroy, who was at Lawler's house the evening the agreement was signed, also represented that he was of the mind that Lawler

---

[4]Specifically, when asked if McCracken advised him concerning the clause waiving antideficiency protection, he replied: "The best I could say is probably."

would not sell without appellants' promise of recourse. MacKay, who signed for both himself and Jacobs, stated that he signed off on the antideficiency waiver, even though he believed the clause was invalid and unenforceable. He also testified that he told Lawler the clause was against public policy and unenforceable. Lawler, however, stated that they did not get into any discussions about the law or whether the antideficiency protections could be waived; what he did recall was that MacKay "volunteered to make it crystal clear that they were personally liable."

2. *Appellants' Case\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

D. *Verdict*

The jury returned its verdict finding that (1) appellants were liable to Lawler for fraud, with damages assessed at $3 million "+ interest + fees as specified in the contract"; (2) none of appellants' affirmative defenses to Lawler's interlocutory deficiency judgment had merit; and (3) appellants were not entitled to recover against Lawler on any of their cross-claims. Following separate deliberations on the issue of punitive damages, the jury found by clear and convincing evidence that appellants were liable to Lawler for fraud, but not for punitive damages. The court entered judgment totaling $6,765,175.45 in damages plus attorney fees, costs and interest. This appeal followed unsuccessful motions for new trial and judgment notwithstanding the verdict.

## II. DISCUSSION

A. *Judgment on Lawler's Action for Fraud*

The judgment awarded Lawler his $3 million deficiency plus fees and interest on jury verdicts for fraud and breach of contract. Both theories were premised on appellants' failure to abide by a clause in their secured promissory note which afforded Lawler "full recourse against Payor without the restriction of the anti-deficiency laws."

1. *Section 580b Applies*

At the heart of this case is the prohibition against deficiency judgments in purchase money transactions. Section 580b states: "No deficiency judgment shall lie in any event after a sale of real property . . . under a deed of trust

---

\*See footnote, *ante*, page 723.

or mortgage given to the vendor to secure payment of the balance of the purchase price of that real property . . . ." Lawler succeeded in surmounting the 580b hurdle at trial because the lower court ruled that an exception to the statute applied. This ruling was incorrect.

### a. Legal Framework

■ Under 580b, a vendor taking back a purchase money trust deed may look only to the security for recovery of the debt; no deficiency judgment will lie following a sale under the trust deed. The vendor thus assumes the risk that the value of the security may become inadequate. (*Brown v. Jensen* (1953) 41 Cal.2d 193, 197-198 [259 P.2d 425].) This rule applies even when the vendor takes a second purchase money trust deed. Section 580b precludes a vendor in second position from bringing an action on the note after the security has been rendered valueless due to sale by the senior lienor. (41 Cal.2d at p. 197.)

According to our state's high court, 580b serves dual purposes of preventing overvaluation and stabilizing land sales.[5] First, because the statute places the risk of inadequate security on the vendors, they are discouraged from overvaluing the security. In turn, precarious land promotion schemes are discouraged because the land's security value is suggestive to the purchaser of its true value. Second, 580b would tend to halt the march of declining property values that would otherwise occur during a depression if defaulting buyers were burdened with great personal liability. (*Roseleaf Corp. v. Chierighino* (1963) 59 Cal.2d 35, 42 [27 Cal.Rptr. 873, 378 P.2d 97].)

Section 580b contemplates the standard purchase money transaction in which the real property vendor retains an interest in the land sold in order to secure payment of part of the purchase price. Variations of the standard transaction are subject to the statute only if they embrace its purpose. (*Roseleaf Corp. v. Chierighino, supra,* 59 Cal.2d at p. 41.)

In *Spangler, supra,* 7 Cal.3d 603, our Supreme Court fleshed out a narrow exception to the scope of section 580b—that of the nonstandard transaction. There, the vendor sold a single-family residence for $90,000—$26,100 cash down with a $63,900 note secured by a purchase money deed of trust. The vendor agreed to subordinate the trust deed to future construction loans of up to $2 million for purposes of constructing an office building on the property.

---

[5]Treatises have criticized these justifications as doubtful and tenuous and the statute as outdated. (See Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) §§ 4.26 to 4.28, pp. 206-209; Sheneman et al., Cal. Foreclosure: Law and Practice (1998) § 6.13, pp. 6-53 to 6-55.)

In return, the buyers agreed to waive their protection from deficiency judgments and personally guarantee the note. The office building was built, but the project was a commercial failure. The construction lender foreclosed, extinguishing the vendor's subordinated security. The vendor then sued for the deficiency.

Affirming a judgment for the vendor, our Supreme Court first announced a two-part inquiry: (1) is the sale a sufficient variation on the standard purchase money situation so as to remove it from automatic application of 580b; and (2) if so, would the purposes of section 580b be served by invoking the statute's protections? (*Spangler, supra,* 7 Cal.3d at pp. 611-612.)

Answering the first question with a "yes," the court held that a sale of real property for commercial development in which the vendor subordinates his or her senior lien under a purchase money deed of trust to that of the construction money lender is sufficiently different from the standard purchase money transaction. The court explained that in the standard transaction, the vendor sells to someone who is going to continue the same or similar use of the property, and thus the present security value of the property is a reliable indicator of its actual market value.

But in the context of subordination to a construction loan where the purchaser intends a different use entailing considerable improvement, the present security value of the property is not a reliable indicator of the ultimate market value. (*Spangler, supra,* 7 Cal.3d at p. 611.) That value depends on the success of the commercial venture, which depends on the "competence, diligence and good faith of the developing purchaser." (*Id.* at p. 613.) In such a case, the purchaser, not the vendor, should "bear the risk of failure, particularly since in the event of default, the junior lienor vendor will lose both the land and the purchase price." (*Ibid.*)

Continuing, the court observed that in a subordination clause situation, the amount of the construction loan is usually very large and the typical vendor cannot raise the cash to bid at the senior sale and thereby protect his or her junior security interest. The only real protection in those circumstances is to allow a deficiency judgment against the commercial developer. (*Spangler, supra,* 7 Cal.3d at p. 614.)

Recently, in *DeBerard Properties, Ltd. v. Lim* (1999)[6] 20 Cal.4th 659 [85 Cal.Rptr.2d 292, 976 P.2d 843] (*DeBerard*), our Supreme Court further

---

[6]Although *DeBerard* came down after judgment was entered in the present case, neither party argues for prospective application. The vitality of the general rule that judicial decisions

clarified and refined the notion of when a subordination agreement spins a transaction outside the intended scope of 580b. There, the buyers had waived 580b protection in connection with a restructuring of their loan following defaults on obligations secured by first and second trust deeds. The vendor agreed to subordinate its deed of trust to any modification of the bank loan. The buyers defaulted again and the bank foreclosed, thereby extinguishing the vendor's junior security. The vendor then sued on the note.

Rejecting the vendor's waiver arguments, the court instructed: "*Spangler's* rule is limited to those situations in which a pronounced intensification of the property's anticipated post-sale use both requires and eventually results in construction financing that dwarfs the property's value at the time of sale. Furthermore, the purchaser must be in a much better position than the vendor to assess the property's possible value and to understand the risks involved in capitalizing on the property's potential. Finally, under all the circumstances of the sale, including the property's development and the financing for that development, conferring section 580b's protection must unfairly thrust 'the risk of the failure of the commercial development . . . upon the vendor' [citation], imposing on it a commercially unreasonable burden . . . . In a situation in which all three factors are found, stability in secured land transactions is deemed to be better maintained by creating an exception to section 580b's safe harbor." (*DeBerard, supra,* 20 Cal.4th at p. 666.)

Distinguishing *Spangler,* the court further pointed out that buyers did not obtain a large construction loan in furtherance of an intensified use. (*DeBerard, supra,* 20 Cal.4th at pp. 667-668.) Indeed, buyers continued with the same use. Additionally, the court emphasized the limited nature of the *Spangler* exception, cautioning that the mere presence of a subordination agreement does not automatically defeat application of 580b. (*DeBerard, supra,* 20 Cal.4th at p. 665.) This is consistent with *Budget Realty, Inc. v. Hunter* (1984) 157 Cal.App.3d 511 [204 Cal.Rptr. 48], in which the seller took a junior trust deed and further agreed to subordinate his lien to construction financing, which buyer never obtained. Holding that this transaction came within the scope of 580b, the reviewing court reasoned that additional jeopardy to seller's security would arise only upon actual subordination, not by the mere presence of the subordination clause. (*Budget Realty, supra,* 157 Cal.App.3d at pp. 516-517.) Similarly, where the seller subordinates to third party purchase money financing *and* agrees to subordinate to anticipated construction financing but that financing is not obtained, section 580b applies. (*Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 915 [88 Cal.Rptr.2d 594].)

operate retrospectively was reiterated in *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978-982, 993 [258 Cal.Rptr. 592, 772 P.2d 1059].

b. *Analysis*

None of the *DeBerard* touchstones are present in this case, and thus we conclude it is a standard transaction.

First, there was no construction financing that dwarfed the property's value at the time of sale. As in *Budget Realty, Inc. v. Hunter, supra,* 157 Cal.App.3d 511, the construction financing never came to pass. True, appellants did obtain a line of credit from CCB for up to $8.2 million for land acquisition and development. But what CCB actually funded was $4.5 million for land acquisition plus $154,000 in loan fees and approximately $872,775 in interest.

Lawler's subordination thus only reached a portion of the purchase price and related costs; for all practical purposes it remained executory with respect to the $1,765,000 construction reserve. That reserve was never tapped because the condition precedent for activating it—namely Town approval of a final subdivision map—never happened. Moreover, this reserve hardly dwarfed the value of the land at the time of sale. Consider the contrast and inverse ratio between this case and *Spangler*: $9 million present value to $1,765,000 potential construction financing versus $90,000 present value to $408,000 construction financing. In the end, CCB bought the property in foreclosure with a credit bid of $6 million—the exact amount Lawler received in cash for it.

Moreover, the line of credit for construction financing did not further a "pronounced intensification" of postsale use, which anticipated and required such financing. With respect to the *anticipated* postsale use, appellants negotiated the construction line of credit for purposes of creating the subdivision infrastructure—a modest change of use at best, conditionally funded at 19.6 percent of the $9 million purchase price of the land itself. More to the point, no change or intensification of use occurred at all during appellants' tenure of ownership. They bought raw land, and it was the same raw land that sold at foreclosure.

Lawler argues that *DeBerard* does not limit the *Spangler* exception to cases where actual construction has occurred. We agree. However, the court is correct in its analysis: Contemplation of an amplified postsale use is the engine that requires *and results in* construction financing that is disproportionate to the property's value at the time of sale. In other words, but for an anticipated radically changed use of the property, there would be no dwarfing construction loan that saddles the purchaser and leads to default.

Second, appellants were not in a "much better position" than Lawler to assess the property's value and evaluate the risks involved in its development. Lawler himself had years of experience attempting to subdivide his

property. In the process he engaged an architect, submitted a subdivision application and commissioned an appraisal. As Lawler points out, appellants were also sophisticated developers who hired professionals to perform "due diligence" attendant to the purchase. But in the end they were simply trying to accomplish what Lawler had previously set out to do. The scales do not tip in Lawler's favor on this point. He is held to the general assumption that one taking a purchase money trust deed—especially in second position— knows the value of his or her security and the risk attendant to it. (*DeBerard, supra,* 20 Cal.4th at p. 668; *Brown v. Jensen, supra,* 41 Cal.2d at p. 197.) "Only when the transaction is sufficiently similar to that in *Spangler* will the vendor's relatively poor knowledge of the property's value trump *Brown's* basic observation: the vendor is assumed to know the value of its security interest and act accordingly." (*DeBerard, supra,* 20 Cal.4th at p. 668.)

Third, bestowing 580b protection in this case would not unfairly thrust the risk of failure of the commercial development onto Lawler, imposing on him an unreasonable burden. Attaining the subdivision map was the gatekeeper to success for the venture. Again, because the map was not forthcoming, construction funding for creating subdivision lots was never advanced and no development occurred. Thus no additional risk fell fairly or unfairly on Lawler. And while it is probable that had appellants succeeded in the subdivision process they would not have defaulted on the loans, the risks attendant to this venture were well known to Lawler.

For all these reasons, we hold that 580b pertains to this transaction.

### 2. *Appellants' Waiver Is Unenforceable*

■ The language of 580b is explicit and unambiguous: A vendor cannot obtain a deficiency judgment against a purchaser in a purchase money secured land transaction. There is no wiggle room in the statute that would permit a vendor to enforce a waiver of its protection in exchange for other concessions. To do so would circumvent the absolute rule and flout its very purpose. (See *DeBerard, supra,* 20 Cal.4th at p. 663.) A party may waive a statutory provision if: (1) the statute does not prohibit doing so; (2) the statute's public benefit is merely incidental to its main purpose; and (3) waiver does not seriously compromise any public purpose fostered by the statute. Because a key purpose of section 580b is to stabilize our state's economy, to the benefit of all, the statute's public benefit *is* a primary purpose that cannot be contravened by private agreement. (*DeBerard, supra,* 20 Cal.4th at pp. 668-669.)

Appellants' waiver of antideficiency protection and coterminous promise to remain personally liable on the note are void as contrary to 580b and

public policy. These agreements are unenforceable and cannot serve as the basis for Lawler's action for breach of contract and fraud. "A void contract, a contract against public policy or against the mandate of the statute, may not be made the foundation of any action, either in law or in equity." (*Chateau v. Singla* (1896) 114 Cal. 91, 94 [45 P. 1015]; *Hooper v. Barranti* (1947) 81 Cal.App.2d 570, 574 [184 P.2d 688].)

Lawler nonetheless attempts to cast the invalid waiver and promise of recourse as an independent tort of false promise, reminding us that our antideficiency statutes do not preclude an action against a borrower for fraud in inducement of a loan. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1237 [44 Cal.Rptr.2d 352, 900 P.2d 601] (*Alliance*).) As a rationale for this rule, the court in *Alliance* recites the general proposition that a suit for fraud is not an attempt to recover on a note secured by the deed of trust. Rather, it " 'stands separate and apart from any action which the antideficiency legislation seeks to preclude.' " (*Id.* at pp. 1237-1238.) Further, our antideficiency laws are not intended to shield wrongdoers from the consequences of their fraudulent acts. (*Id.* at p. 1238.)

At first glance the *Alliance* rule seems like a formidable hurdle, but it is not. The promise here of full recourse without restriction of the antideficiency laws is nothing more than an unenforceable waiver of 580b. The promise strikes at the heart of the protective purposes of 580b and as such can never be said to stand separate and apart from an action that the statute seeks to preclude.

None of the cases allowing a lender to sue a borrower for fraud involve a prohibited antideficiency waiver. *Alliance* itself does not even fall into the camp of lawsuits pitting lender against borrower; rather, it was lender versus third party nonborrowers. (*Alliance, supra*, 10 Cal.4th at p. 1246.) In *Manson v. Reed* (1986) 186 Cal.App.3d 1493 [231 Cal.Rptr. 446], the borrowers perpetrated a fraudulent cash-back financing scheme involving dual escrows that they believed would shield them from recourse. (*Id.* at pp. 1498-1500.) Similarly, in *Bell v. Roy* (1986) 187 Cal.App.3d 694 [232 Cal.Rptr. 83], the purchaser surreptitiously obtained a large loan and "cashed out" the seller's equity to his own benefit. (*Id.* at p. 700.) And in *Guild Mortgage Co. v. Heller* (1987) 193 Cal.App.3d 1505 [239 Cal.Rptr. 59], the buyers misrepresented their financial qualifications and plans for the property when obtaining the loan in the first instance. (*Id.* at pp. 1510, 1512.) Finally, the developer-purchasers in *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101 [135 Cal.Rptr. 802] fraudulently diverted loan funds and breached their guarantee to complete offsite improvements. (*Id.* at pp. 119-120.)

Unlike the above cases, which all involve credit fraud, illegal diversion of funds and the like, Lawler's fraud action was for nonperformance of an invalid waiver of 580b. Seeking recovery of the $3 million deficiency he suffered as a sold-out junior plus punitive damages, Lawler has attempted to accomplish by indirection what 580b prohibits.

Taking a slightly different tack, we also note that unlike the above cases, appellants inserted the waiver clause *at Lawler's insistence*—in exchange for his agreement to subordinate his note. Surely Lawler's fraud claim must founder for failure to sustain the element of reasonable reliance. As a matter of law it is unreasonable to rely on an illegal waiver, especially when you are the party insisting on it.

B.   *Judgment on Cross-complaint and Defenses**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### III.   DISPOSITION

We reverse the judgment in favor of Lawler on his complaint, but affirm in his favor on the cross-complaint. Parties to bear their own costs on appeal.

Poché, Acting P. J., and Sepulveda, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 10, 2001.

---

*See footnote, *ante*, page 723.